**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

| | |
|---|---|
| **In re:** | **Case No. 15-_____** |
| **CARDIAC SCIENCE CORPORATION,** | **Chapter 11** |
| **Debtor.** | **Hon. Robert D. Martin** |

---

**AFFIDAVIT IN SUPPORT OF FIRST DAY MOTIONS**
**BY MICHAEL KANG, CHIEF RESTRUCTURING OFFICER**
**OF CARDIAC SCIENCE CORPORATION**

---

| | | |
|---|---|---|
| STATE OF WISCONSIN | ) | |
| | ) | ss. |
| COUNTY OF MILWAUKEE | ) | |

Michael Kang, being duly sworn, deposes and states:

1.      I am the Chief Restructuring Officer of Cardiac Science Corporation, the debtor and debtor-in-possession in the above-captioned Chapter 11 case ("CSC" or "Debtor").  I am generally familiar with the Debtor's day-to-day operations, business affairs and books and records.

2.      On the date hereof (the "Petition Date"), CSC, a Delaware corporation, filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its properties as a debtor-in-possession.

3.      In addition to typical or operational procedures, the Debtor has requested permission to continue business practices beneficial to its operations in its "first day" motions (collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among

WHD/11932840.4

other things, avoiding disruption of the Debtor's business operations, maintaining customer

loyalty, vendor and supplier confidence and bolstering employee morale.  The relief requested

in the First Day Motions is crucial to the Debtor's efforts to maintain the value of its business.

4.      I submit this affidavit (the "<u>Affidavit</u>") in support of the First Day Motions in

this case.  Any capitalized terms not expressly defined herein shall have the meanings ascribed

to such terms in the relevant First Day Motion.  All facts set forth in this Affidavit are based on

my personal knowledge, upon information supplied to me by the Debtor's employees or

professionals assisting the Debtor, upon my review of relevant documents, or upon my opinion

based on my experience and knowledge of the Debtor's operations, financial condition and

present financial outlook.  If called upon to testify, I could and would testify competently to the

facts set forth herein.  I am authorized to submit this Affidavit.

5.      Part I of this Affidavit describes the Debtor's business and the circumstances

surrounding the commencement of the Chapter 11 case.  Part II sets forth the relevant facts in

support of the First Day Motions.

<b><u>PART I – BACKGROUND</u></b>

**A.     The Debtor's Business**

6.      The Debtor is a private company headquartered in Waukesha, Wisconsin that

develops, manufactures and sells a variety of advanced diagnostic and therapeutic cardiology

devices and systems, including automated external defibrillators (AED), hospital defibrillators

and related products and consumables.  The Debtor also provides a portfolio of training,

maintenance and support services for its products.  The Debtor's principal place of business is

in Deerfield, Wisconsin.

7.      CSC currently employs approximately 200 people in two facilities located in

Wisconsin, and another 93 part time "educators" around the country who educate the Debtor's

2

customers on how to use its products. The Debtor wholly owns six foreign subsidiaries and is the majority owner of a joint venture in China.[1] Together with its subsidiaries, the Debtor has customers in more than 100 countries.

8.      The Debtor was incorporated on February 24, 2005, as CSQ Holding Company to effect the business combination of Quinton Cardiology Systems, Inc. ("Quinton") and Cardiac Science, Inc. ("CSI"). In the merger transaction, the outstanding shares of common stock of both Quinton and CSI were cancelled and the shareholders of Quinton and CSI were issued common stock of Cardiac Science Corporation in exchange. At the time, the Debtor was a public company.

9.      Effective December 3, 2010, Opto Circuits (India) Ltd., a publicly traded company in India ("Opto Circuits"), acquired 100% of the outstanding stock of CSC and its subsidiaries. On June 15, 2011, Opto Circuits transferred all CSC shares to Opto Cardiac Care Ltd. ("Opto Cardiac"), a privately held company incorporated under the laws of India. As a result of this transaction, Opto Cardiac is the immediate parent company of the Debtor and Opto Circuits is the immediate parent company of Opto Cardiac.

10.     Opto Cardiac also owns Criticare Systems, Inc., a Wisconsin-based affiliate of the Debtor ("Criticare"). In operation since 1984, Criticare is an international medical device company that is also headquartered in Waukesha, Wisconsin. Criticare develops, manufactures and markets patient monitoring systems and accessories used in anesthesia, critical care, medical transport and outpatient care settings.

---

[1] The foreign subsidiaries are the following, with the location of their principal places of business listed in parentheses: Cardiac Science International A/S (Denmark), Cardiac Science UK Limited (United Kingdom), Cardiac Science Japan K.K. (Japan), Cardiac Science France S.A.S. (France), Cardiac Science Deutschland CMBH (Germany), and Cardiac Science Italy S.R.L. (Italy). The majority owned joint venture is Cardiac Science Medical Device Co. Ltd. (China). None of these foreign entities is the subject of an insolvency proceeding.

WHD/11932840.4

11.     Although Criticare is not a debtor in these bankruptcy proceedings, certain aspects of the Debtor's business are related to Criticare's.  For example, the two companies participate in joint health and dental benefit plans and share office space.

12.     It is my understanding that, on October 19, 2015, Criticare made a voluntary assignment for the benefit of its creditors, and that John Stark was appointed as receiver for Criticare pursuant to chapter 128 of the Wisconsin Statutes.  I understand that Criticare's receivership case is pending in the Circuit Court of Waukesha County, Wisconsin.

13.     On March 29, 2013, the Debtor sold its Diagnostic Cardiology division to a third party.  The Diagnostic Cardiology division represented approximately one-third of the Debtor's revenue in fiscal year 2013.

**B.      The Debtor's Pre-Petition Indebtedness**

14.     Prior to the Petition Date, the Debtor and the parties listed below entered into a loan agreement designated as an Amended and Restated Facilities Agreement, dated as of December 31, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Facility Agreement"), by and among CSC as borrower, Opto Circuits as guarantor, Criticare as guarantor (collectively with Opto Circuits, the "Guarantors"), DBS Bank Ltd, Bangalore Branch, as arranger and security trustee (in such capacity the "Security Agent"), and DBS Bank Ltd, Singapore, as sole lender (in such capacity, "DBS") and as agent (in such capacity, the "Administrative Agent").

15.     On or about September 29, 2015, CFS 915 LLC ("CFS 915") (a) purchased the entire indebtedness under the Pre-Petition Facility Agreement and became the sole lender under the Pre-Petition Facility Agreement and (b) was appointed Security Agent and Administrative Agent as successor to DBS Bank Ltd, Bangalore Branch and DBS, respectively.

WHD/11932840.4

16.     As of the Petition Date, the Debtor was indebted to CFS 915 in the aggregate

principal amount of approximately $87 million, resulting from loans and deferred interest made

by CFS 915 or DBS to the Debtor pursuant to the Pre-Petition Facility Agreement (plus

attorneys' fees, costs and interest accrued and unpaid thereon) (collectively, the "Pre-Petition

Indebtedness").

17.     The Pre-Petition Indebtedness is secured by liens and security interests granted

by the Debtor to CFS 915 upon and in (i) substantially all of the assets of CSC pursuant to the

Second Amended and Restated Security Agreement dated as of December 31, 2014, between

CSC and the Security Agent (as amended, the "CSC Security Agreement"), (ii) all of the stock

of CSC pursuant to the Amended and Restated Pledge Agreement dated as of December 31,

2014, between Opto Cardiac as pledgor, and the Security Agent as pledgee (as amended, the

"CSC Pledge Agreement"), (iii) all of the stock of Criticare pursuant to the Amended and

Restated Pledge Agreement dated as of December 31, 2014, between Opto Cardiac as pledgor,

and the Security Agent as pledgee (as amended, the "Criticare Pledge Agreement"), (iv) certain

real property owned by MCH Realty, LLC ("MCH"), an affiliate of CSC, pursuant to the Open-

End Mortgage to Secure Present and Future Loans Under Chapter 25 of Title 34 of the General

Laws, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of

December 31, 2014 (as amended, the "MCH Mortgage") between MCH, a Rhode Island limited

liability company, as mortgagor, and the Security Agent as mortgagee.  The Pre-Petition

Facility Agreement, the CSC Security Agreement, the CSC Pledge Agreement, the Criticare

Pledge Agreement and the MCH Mortgage, together with all other "Finance Documents" (as

defined in the Pre-Petition Facility Agreement) are referred to herein as the "Pre-Petition Loan

Documents."

18.    The assets of CSC securing the Pre-Petition Indebtedness include, without limitation, equipment, inventory, instruments, chattel paper, general intangibles, contracts, documents of title, and all other tangible and intangible personal property, and the proceeds and products thereof (the "Pre-Petition Collateral"). The liens and security interests of the Lender on the Pre-Petition Collateral are referred to herein as the "Pre-Petition Liens."

19.    Also prior to the Petition Date, the Debtor and HDFC Bank Limited ("HDFC") entered into that certain Facility Agreement dated as of March 26, 2011 (as amended, the "HDFC Facility Agreement") among CSC, Opto Circuits and HDFC. As of the Petition Date, based on the Debtor's books and records, the Debtor was liable to HDFC in the aggregate principal amount of approximately $6.3 million in respect of loans made by HDFC to the Debtor pursuant to the HDFC Facility Agreement (the "Pre-Petition HDFC Obligations"). The Pre-Petition HDFC Obligations are secured by the Pre-Petition Collateral pursuant to the Security Agreement dated as of March 26, 2011 between CSC and HDFC (as amended, the "HDFC Security Agreement"). The liens and security interests of HDFC on the Pre-Petition Collateral are referred to herein as the "HDFC Liens."

20.    I understand that the HDFC Liens are senior in priority to CFS 915's Pre-Petition Liens.

21.    Finally, in September 2011, the Debtor entered into a revolving credit agreement with U.S. Bank, National Association ("U.S. Bank") that has a maturity date of September 4, 2014. The credit line of $10 million is guaranteed by a standby letter of credit issued by ICICI Bank, which is headquartered in Mumbai, India ("ICICI"). U.S. Bank has declared a default under its credit agreement, and has drawn on the letter of credit. It is my understanding that ICICI fully paid its obligations under the standby letter of credit on October 19, 2015.

6

## C.    Events Leading to the Chapter 11 Filing

22.    In the years leading up to this chapter 11 filing, the Debtor was operating under a high cost structure that prevented the company from making timely principal and interest payments in connection with the Pre-Petition Indebtedness.  The Debtor has incurred various defaults on its obligations to DBS (now CFS 915) and HDFC for over two years.  These defaults include, among others, recurring payment defaults and covenant defaults.

23.    As a result of these liquidity problems, the Debtor implemented various cost reduction programs that, for example, included a reduction-in-force of approximately 15 employees in September, 2015.  In addition, I understand that, within the last year, the Debtor explored various strategic alternatives to de-lever its balance sheet and address the defaults.

24.    Notwithstanding the attempts at cost reduction, the Debtor's liquidity constraints continued throughout 2015, to the point that CSC was unable to obtain additional trade credit from vendors as it fell behind in making payments.  This led to a critical shortage of raw materials and replacement accessories to operate the business.

25.    After CFS 915 purchased the indebtedness under the Pre-Petition Facility Agreement in late September, 2015, CFS 915 exercised its rights under the various Pre-Petition Loan Documents to remove the officers and directors of the Debtor.  When the new officers and directors were appointed, the Debtor requested forbearance under the Pre-Petition Facility Agreement and the other Pre-Petition Loan Documents, which CFS 915 granted and provided overadvance funding in the approximate amount of $3,750,000.

26.    As CFS 915 was unwilling to provide additional funding outside of Chapter 11, the Debtor was forced to file this Chapter 11 case because it had no other sources of funding, there was insufficient time to obtain a new loan from a third party without irreparable harm to

the business, and any new lender or investor would have required a priming lien with respect to the Pre-Petition Indebtedness.

### D. The Debtor's Intent to Sell

27.     This Chapter 11 case has been initiated to enable the Debtor to stabilize its operations, obtain access to new financing and maximize the value of the Debtor's assets through a sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code (the "Sale").

28.     To that end, prior to the Petition Date the Debtor and its new Board of Directors interviewed a number of investment bankers and, on October 16, 2015, the Debtor hired Livingstone Partners LLC ("Livingstone") to serve as its investment banker.

29.     In addition, prior to the Petition Date, the Debtor and its advisors negotiated the terms of a credit bid and a debtor-in-possession financing facility (as discussed in further detail below) with CFS 915 (in its capacity as a stalking horse purchaser, the "Stalking Horse Buyer") whereby the Stalking Horse Buyer would be designated the stalking horse purchaser for the Debtor's assets subject to higher or otherwise better offers to be determined through the continuation of a marketing process being conducted by Livingstone.

30.     On October 19, 2015, the Debtor and the Stalking Horse Buyer substantially finalized the purchase agreement with the Stalking Horse Buyer, which is subject to higher and better offers through an auction process and the Court's approval.  That process and the related bidding procedures have been presented to the Court for approval pursuant to the Debtor's sale motion, which was filed with the Court on the Petition Date (the "Sale Motion").  Although the Sale Motion was filed on the Petition Date, the Debtor is not requesting emergency relief with respect thereto and will request a hearing to approve the bidding procedures and stalking horse purchase agreement, among other things, on or before November 19, 2015.

31.    The proposed sale process contemplates, among other things, that interested parties will be afforded an opportunity to submit higher and better offers for the Debtor's assets and that an auction will be held to the extent that qualified offers are received from any other parties.  Thereafter, either the Stalking Horse Buyer or such other party submitting a higher or better offer will be authorized to purchase the Debtor's assets free and clear of liens, claims and interests pursuant to Section 363 of the Bankruptcy Code upon entry of an order of the Bankruptcy Court approving such sale.

## PART II – FIRST DAY MOTIONS

32.    It is critical that the Debtor obtain the relief sought in its First Day Motions.  The factual background and support for each of the First Day Motions is provided below.

**A.     Motion to Obtain Debtor-In-Possession Financing (the "DIP Motion")**

33.    The Debtor is requesting Court authority to enter into the Debtor-in-Possession Loan Agreement substantially in the form submitted to the Court (the "DIP Loan Agreement") and any other documents or instruments required to be executed and delivered in connection therewith (together with the DIP Loan Agreement, the "DIP Loan Documents"), and to borrow money, use cash collateral and perform its obligations under the DIP Loan Documents. Generally speaking, the DIP Loan Agreement provides for a revolving credit facility in the amount of $9 million, permits the Debtor to use cash collateral, imposes a priming lien on the Pre-Petition Collateral in favor of CFS 915, and provides adequate protection to CFS 915 and HDFC.  All indebtedness and obligations incurred pursuant to the DIP Loan Documents (including principal, accrued and unpaid interest and costs and expenses, including attorneys' fees and expenses) are referred to herein as the "DIP Indebtedness," and together with the Pre-Petition Indebtedness, as the "Indebtedness."

WHD/11932840.4

34.     The Debtor proposes to grant as security for repayment of all DIP Indebtedness first priority security interests and liens (the "DIP Liens") in and upon substantially all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature whatsoever (excluding actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions"), but, subject to the entry of a Final Order after notice and a hearing, including the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds")), and the proceeds, products, rents and profits of all of the foregoing, all as described more fully in the DIP Loan Documents (all of the foregoing, the "DIP Collateral"), subject only to: (1) a carve-out for professionals and (2) the HDFC Liens and HDFC Adequate Protection Liens.[2]  CFS 915 is also granted a super priority claim having priority over all costs and expenses of administration in this case.

35.     The Debtor was unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtor's assets junior to the existing liens.  After careful consideration of all available options, the Debtor determined, in the exercise of its sound business judgment, that it requires post-petition financing to meet its ongoing working capital and general business needs, and that the terms of the DIP Loan Agreement are the most favorable terms available under the circumstances.  The DIP Loan Agreement will reasonably address the Debtor's financing requirements and provide the Debtor the liquidity necessary to maintain its going concern value pending the conclusion of the Debtor's proposed sale process.  Accordingly, subject to the Court's approval, the Debtor

---

[2]  The HDFC Adequate Protection Liens shall secure an amount of the Pre-Petition HDFC Obligations equal to the aggregate diminution in the value of HDFC's interest in the Pre-Petition Collateral occurring from and after the Petition Date.

WHD/11932840.4

has determined to enter into the DIP Loan Agreement with CFS 915.  The principal terms of the

DIP Loan Agreement are summarized in the DIP Motion.

36.     The DIP Facility is the product of arm's length and good faith negotiations

between CFS 915 and the Debtor.  It provides the Debtor with continued financing pursuant to

(i) the terms of the DIP Loan Agreement, (ii) the Approved Budget annexed to the DIP Motion,

and (iii) the terms of the proposed Interim Order submitted with the DIP Motion (pending

approval of the DIP Loan Agreement on a permanent basis at the Final Hearing).

37.     At the present time the Debtor is continuing to operate on overadvances granted

by CFS 915.  These funds are insufficient to cover all costs of operation, and while debt builds,

the Debtor's relationship with its creditors and customers deteriorates.  The current state of

affairs is untenable, and unless resolved immediately will lead to a shutdown of operations.

Any shutdown of operations, and related interruption of supply to Debtor's customers will

devastate the employees and the Debtor's going concern value, and will diminish greatly the

prospect for maximizing asset value through an expedited sale process.

38.     Granting the Debtor the relief requested in the DIP Motion will enable the

Debtor to accomplish its strategic restructuring goals and successfully complete a sale process

and consummate a value-maximizing transaction. As of the Petition Date, CFS 915 has not

agreed to the Debtor's use of cash collateral unless the DIP Motion is granted, and the Debtor is

facing a liquidity crisis and needs immediate access to credit under the DIP Loan Agreement to

fund working capital and certain other costs pending a sale transaction. Absent this new

liquidity, not only would the Debtor's ability to maximize the value of its estate and

successfully preserve asset values be jeopardized, but the Debtor also could be forced to

immediately and abruptly cease operations at its facilities to the direct detriment of all the

Debtor's stakeholders.

39.      For the foregoing reasons I believe the relief requested in the DIP Motion is

necessary and in the best interests of the Debtor's estate, its creditors and other parties-in-

interest.

**B.      Motion for Order Establishing Certain Notice, Case Management and
        Administrative Procedures ("Case Management Motion")**

40.      The Debtor has approximately 1,700 creditors.  The Debtor anticipates that many

of its creditors and other parties-in-interest will file requests for service in this Chapter 11 case.

The Debtor also expects that numerous motions and applications will be filed in this Chapter 11

case in pursuit of various forms of relief.  Permitting service by e-mail on most parties, and

establishing the notice procedures, special hearing procedures, and other case management

procedures described in the Case Management Motion will promote the efficient and orderly

administration of this Chapter 11 case.

41.      With respect to service, the Debtor proposes that papers filed in this Chapter 11

case be served on a service list that includes the most significant stakeholders in the case and any

party that files a notice request.  All parties-in-interest will be assured of receiving appropriate

notice of matters affecting their interests and ample opportunity to prepare for and respond to

such matters, but a shortened mailing list will significantly reduce the substantial administrative

and financial burden that would otherwise be placed on the Debtor's estate.

42.      Except in certain circumstances, service may be conducted by e-mail for parties

who are registered users of the Court's electronic filing system, or who included an e-mail

address in their notice request, provided that the proposed e-mail service rules are followed.

Allowing electronic service of documents according to the requested procedures will further

WHD/11932840.4

reduce the administrative and financial burden of this Chapter 11 case on the Debtor's estate, as well as on other serving parties, and will in many cases allow for more expedient service of documents. The Debtor anticipates that hundreds of entities, in addition to the Debtor's core creditors, may request to be added to the notice list. The costs associated with copying and mailing or otherwise serving all documents filed with the Court to all such entities, will impose an extraordinary and expensive administrative and economic burden on the Debtor. Indeed, constant mass mailings will be extremely costly to the Debtor's estate and will require the Debtor to divert limited resources to comply with all administrative requirements.

43.    For hearings, the Debtor proposes that most motions be noticed on 14 days "negative" notice, with the opportunity for a hearing if an objection is filed. The Debtor will work to ensure that hearings are combined where possible to avoid the costs and burdens associated with the possibility of frequent and fragmented hearings. Parties may move for emergency or reduced notice hearings upon affidavit and a showing of good cause.

44.    I believe that adopting the notice procedures described in the Case Management Motion will substantially reduce administrative burdens and result in significant cost savings to the Debtor's estate. Accordingly, I believe that the relief requested in the Case Management Motion is in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

**C.    Motion for an Order Granting Additional Time to File Schedules and Statements ("Motion to Extend Time")**

45.    The Debtor seeks additional time to file its schedules of assets and liabilities, schedule of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements"). The conduct and operation of the Debtor's business requires it to maintain voluminous books and records and complex accounting systems. Given the size and complexity of its business

WHD/11932840.4

operations and the fact that certain pre-petition invoices have not yet been received or entered

into the Debtor's financial accounting systems, the Debtor has begun, but has not yet finished,

compiling the information required to complete the Schedules and Statements.

46.     I believe that the relief requested in the Motion to Extend Time is not only

necessary but in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

**D.      Motion to Retain Garden City Group, LLC as Notice Agent and Claims Agent
("Claims Agent Motion")**

47.     The magnitude of the Debtor's creditor body makes it impracticable for the Office

of the Clerk of the Bankruptcy Court for the Western District of Wisconsin to undertake the task

of processing notices to creditors and processing claims made by creditors in this Chapter 11

case.

48.     I respectfully submit that the most effective and efficient manner of noticing these

creditors and interested parties of the filing of this Chapter 11 case, and to transmit, receive,

docket, maintain, photocopy and scan claims, is for the Debtor to engage an independent third

party to act as the Debtor's notice and claims agent.  The Debtor may also require the services of

an agent to administer votes pursuant to a plan of reorganization.  Accordingly, the Debtor

proposes to employ Garden City Group, LLC ("GCG") as notice, claims and balloting agent, to

assist the Debtor in distributing notices, as necessary, and to process other administrative

information pertaining to this Chapter 11 case.  GCG is a firm that specializes in noticing, claims

processing, balloting and other administrative tasks which must be performed in this Chapter 11

case.  The Debtor chose GCG based on its reputation, its experience and the competitiveness of

its fees.

49.     The Debtor proposes to retain GCG on substantially the terms and conditions set

forth in the engagement agreement attached to the Claims Agent Motion.  I believe that GCG is

14

WHD/11932840.4

well-qualified to serve in this capacity and that GCG's retention is in the best interests of the

Debtor's estate and its creditors.

**E.    Motion to Pay Sales, Use, Franchise and Other Similar Taxes ("<u>Taxes Motion</u>")**

50.     In the ordinary course of its business, the Debtor (a) incurs certain taxes

including, but not limited to, use and franchise taxes, (collectively, the "<u>Taxes</u>"); and (b) is

charged fees, licenses and other similar charges and assessments (collectively the "<u>Fees</u>")

payable to various taxing and licensing authorities (collectively, the "<u>Taxing Authorities</u>").  The

Taxes and Fees are paid to the various Taxing Authorities either monthly, quarterly or yearly.

The Debtor estimates that the total amount of Taxes and Fees actually due pre-petition and not

yet paid as of the Petition Date is approximately $4,000.  This amount represents a very small

fraction of the Debtor's total assets.

51.     Nonetheless, I believe that the failure to pay the Taxes and Fees could have a

material, adverse impact on the Debtor's ability to operate in the ordinary course of business.  I

believe that some, if not all, of the Taxing Authorities may cause the Debtor to be audited if

certain of the Taxes and Fees are not paid when due.  Such audits will unnecessarily divert the

Debtor's attention from the operation of its business and the reorganization process.  Taxing

Authorities may also pursue judicial or administrative proceedings against the Debtor's officers,

directors or managers to recover unpaid taxes.  Use taxes, for example, are considered "trust fund

taxes," which are the property of the appropriate Taxing Authority, and failure to remit use taxes

can lead to the Taxing Authorities pursuing personal liability of officers, directors or managers

based on their respective roles in the Debtor's failure to remit.  In addition to avoiding audits and

proceedings to impose personal liability, the Debtor needs to maintain the ability to prove its

corporate standing and status to enter into certain transactions, to maintain lawsuits and to obtain

insurance.  Unless Taxes and Fees are paid, the Debtor's ability to establish its corporate status is

WHD/11932840.4

threatened or voided because Taxing Authorities routinely withhold corporate services to

companies that fail to pay franchise and related fees.

52.    Therefore, I believe that the relief requested in the Taxes Motion is in the best

interests of the Debtor's estate, its creditors and other parties-in-interest.

**F.    Motion to Continue Existing Cash Management Procedures ("Cash Management Motion")**

*Bank Accounts*

53.    Before the Petition Date, the Debtor, in the ordinary course of business,

maintained six bank accounts (collectively, the "Bank Accounts") which are listed in Exhibit A

to the Cash Management Motion.  The function of each of the Bank Accounts in the Debtor's

overall cash management system is described in the Cash Management Motion.  All but one of

the Debtor's Bank Accounts are held at U.S. Bank, an FDIC-insured banking institution which

has complied with 11 U.S.C. § 345 and maintains appropriate government guaranteed deposit

protection insurance.  The sixth bank account is maintained at Waukesha State Bank.

Eventually, the Debtor intends to move funds from the Waukesha State Bank account to U.S.

Bank.

54.    The Debtor seeks a waiver of the U.S. Trustee's requirement that the Bank

Accounts be closed and that new post-petition bank accounts be opened.  Complying with this

U.S. Trustee requirement would be very time-consuming, disruptive and would divert the

Debtor's efforts from focusing on its restructuring.  Furthermore, maintaining the Bank Accounts

would greatly facilitate the Debtor's transition to the post-petition period.  To avoid delays in

paying debts incurred post-petition and to ensure as smooth a transition into Chapter 11 as

possible, the Debtor should be permitted to maintain the existing Bank Accounts and, if

WHD/11932840.4

necessary, to open new accounts and close existing accounts in the ordinary course of business operations.

55.     To maintain a clear distinction between pre-petition and post-petition claims and payments, and to prevent the inadvertent payment of pre-petition claims, the Debtor established a detailed, internal system for tracking claims and payments that will separate pre-petition and post-petition payments so that each can be treated in accordance with the Bankruptcy Code and this Court's orders.  Furthermore, the Debtor will work closely with U.S. Bank and Waukesha State Bank to ensure that the bank honors only those payments that the Court authorizes the Debtor to make.

*Existing Forms and Checks*

56.     To minimize expenses to its estate, the Debtor has requested that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterheads, purchase orders and invoices) existing immediately prior to the Petition Date without reference to the Debtor's status as debtor-in-possession.  The Debtor will, however, immediately make reference to its debtor-in-possession status on all checks issued after the Petition Date.  Parties doing business with the Debtor will likely be aware of its status as debtor-in-possession as a result of the size and notoriety of its Chapter 11 case, and general press coverage.  A requirement that the Debtor change its business forms would be expensive and burdensome to the Debtor's estate and disruptive to the Debtor's reorganization.

*Cash Management System*

57.     The Debtor uses a centralized, integrated cash management system (the "Cash Management System").  The Debtor's Cash Management System is similar to the cash management systems utilized by other similar companies, and is described in detail in the Cash

17

Management Motion as Exhibit B, which illustrates the flow of funds through the Debtor's Cash Management System.

<i>Need to Continue Cash Management System</i>

58.      The Debtor's current Cash Management System has been in place for a long period of time.  The system functions well for the Debtor in terms of tracking corporate expenditures, matching cash with cash needs and ease of account record keeping, movement of funds and the development of timely, accurate account balance, process and presentation information.

59.      It would be inefficient for the Debtor to establish an entirely new system of accounts and a new cash management system.  Preserving the "business as usual" atmosphere (while respecting the restrictions on the ability to pay pre-petition claims without specific Court order), and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtor's Cash Management System will facilitate the Debtor's reorganization efforts.  Thus, under the circumstances, maintaining the Debtor's Cash Management System is both essential and in the best interests of its estate and creditors.  The Debtor will continue to maintain strict and accurate records with respect to all transfers of cash so that transactions can be readily traced and evaluated.

60.      If the Debtor is not permitted to continue to utilize its Cash Management System in its current form, its operations will be severely, and perhaps irreparably, harmed. Accordingly, and based on the foregoing, the Court should authorize the Debtor's continued use of its existing Cash Management System.

**G.      Motion to Pay Wages, Salaries and Other Compensation ("<u>Wage Motion</u>")**

61.      As of the Petition Date, the Debtor employed approximately 200 full time employees, and 93 part time "educator" employees (the "<u>Employees</u>").  These Employees

18

perform a variety of critical functions for the Debtor's business.  Their skills and their

specialized knowledge and understanding of the Debtor's infrastructure, assets and operations, as

well as their relationships with customers, vendors and other third parties, are essential to the

administration of this case, the preservation of the Debtor's business and the Debtor's ability to

consummate a successful reorganization.  Without the Employees, the Debtor would not be able

to manufacture products for its customers and the enterprise value of the Debtor would be lost.

Further, I believe that any purchaser of the Debtor's business would want the Debtor's labor

force to remain intact while this Chapter 11 case is pending.

      62.     In the ordinary course of the Debtor's business prior to the Petition Date, the

Employees were owed or had accrued various sums for wages, salaries, contractual

compensation, overtime pay, sick pay, holiday pay, vacation pay, benefit programs such as group

life and disability, and other accrued compensation (collectively, "Pre-petition Compensation").[3]

The Debtor estimates that, as of the Petition Date, the Debtor had not issued payment for

approximately $400,000 in Pre-petition Compensation owed to Employees.  In addition, some

payroll and expense reimbursement checks issued to employees prior to or on the Petition Date

(the "Outstanding Paychecks") have not yet been presented for payment or have not yet cleared

the banking system and accordingly were not honored and paid as of the Petition Date.

However, most pre-petition checks to employees have been deposited and have cleared.  Given

the substantial use of ACH payroll deposits, the Debtor estimates the aggregate amount of the

Outstanding Paychecks is less than $10,000.

---

[3]   For purposes of this Motion, Pre-petition Compensation does not include self-funded health, dental, disability, flexible benefit and similar plans which will be addressed by separate motion.

WHD/11932840.4

63.     No single employee is owed more than the statutory priority amount of $12,475

set in 11 U.S.C. § 507(a)(4) for pre-petition wages, salaries or commissions, including vacation

and sick leave pay accruing in the 180 days before the Petition Date.  The only circumstance in

which an Employee's compensation would exceed the statutory cap would be if an Employee

had exceptional sales performance and/or incurred significant expenses on behalf of the Debtor

during the month of October.  In such a circumstance, the Employee's efforts, and continued

engagement, would be essential to the continued success of the Debtor and the Debtor's

successful reorganization.

64.     Pre-petition Compensation also includes vacation pay.  Part of accrued vacation

pay has not yet been paid to or for the benefit of employees because such benefits, although

accrued prior to the Petition Date, would not normally be paid until a vacation is actually taken.

While some employees have accrued vacation for periods more than 180 days prior to the

Petition Date, the Debtor only requests that employees be allowed to take paid vacation and

receive compensation equal to the amount of vacation accrued in the last 180 days.  However,

the Debtor is not seeking and does not request permission to pay accrued vacation to any

employee who is terminated or who terminates his or her employment with the Debtor.

65.     As of the Petition Date, the Debtor also had accrued deductions from employees'

paychecks to make payments on behalf of employees for taxes, disability benefits, dental

insurance, life insurance, retirement benefits, garnishments and support payments, insurance

programs, retirement benefits (such as its 401(k) program), contributions to charities,

membership dues, union dues, and other similar programs on account of which the Debtor

deducts a sum of money from an employee's paycheck and pays that amount to a third party

(collectively, "Deductions").  The Debtor believes that all of the Deductions collected pre-

petition have been paid to the appropriate third parties prior to the Petition Date, but some may

not have been processed or cleared the banking systems in the ordinary course of business.

66.     It is important to note that the Deductions represent amounts withheld from

employee's pay with the intention that such amounts will be paid to third party providers or

benefit plans.

67.     As of the Petition Date, many of the Employees were owed or had accrued

various sums for travel, moving expenses and other reimbursable expenses ("Business

Expenses").  Included in these Business Expenses are charges incurred on behalf of the Debtor

by approximately 72 Employees who use corporate American Express credit cards (the "Credit

Card Program").  American Express invoices the Debtor directly for these charges and,

following the Debtor's review and approval, such charges are paid directly by the Debtor to

American Express.  Outstanding pre-petition charges relating to the Credit Card Program are

estimated to be approximately $120,000 (an average of about $1,600 per card), and these charges

may cause some employees to exceed the § 507(a)(4) priority cap.

68.     But even to the extent that an Employee's Business Expenses exceed the $12,475

priority cap, I believe it is in the best interest of the estate to pay the full amount of these debts.

The Debtor pays invoices for the corporate credit cards directly to American Express, but the

accounts are held in the names of the Employees.  If the Debtor fails to remit payment to

American Express for valid and legitimate Business Expenses, it may negatively impact the

Employees' credit.  All such Business Expenses were incurred as business expenses on the

Debtor's behalf and with the understanding that they would be reimbursed.  So to avoid financial

harm to Employees who incurred reimbursable Business Expenses under the Credit Card

Program, it is important that the Debtor be able to continue the reimbursements in accordance with pre-petition practices.

69.      In addition, prior to the Petition Date the Debtor withheld money from Employees' paychecks on account of various federal, state and local income, FICA, Medicare and other taxes (collectively, "Withholdings") for remittance to the appropriate federal, state or local taxing authorities.  The Debtor is also required to pay the employer portion of such taxes, as well as unemployment compensation contributions, processing fees, administrative charges and similar obligations to taxing authorities and third party providers.  The Debtor believes that there are no Withholdings attributable to Pre-petition Compensation earned, but that have not been remitted to the applicable taxing authorities.  The Debtor estimates that the outstanding amount of accrued taxes and related charges in respect of Pre-petition Compensation is approximately $135,000.

70.      To avoid the serious disruption of the Debtor's Chapter 11 case that could result from the nonpayment of any withholding taxes, the Debtor seeks authority to remit all Withholdings to the applicable taxing authorities to the extent that the Withholdings have not already been remitted.[4]  Many taxing authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.  Accordingly, if these amounts remain unpaid, there is a risk that the Debtor's officers and directors may be subject to lawsuits or administrative proceedings on account of any such non-payment while this Chapter 11 case is pending.  Lawsuits or administrative proceedings of this type obviously would constitute a significant distraction for

---

[4] The Debtor is current in its required payments of withholding taxes, however, the amounts owed at any point in time varies depending on state and federal withholding cycles.

WHD/11932840.4

officers and directors at a time when they should be focused on the Debtor's efforts to administer

this case and preserve and maximize the value of its assets.

71.    A large part of the value of Debtor's business in a § 363 sale is dependent upon its

ability to continue as a going concern, including the maintenance of its workforce and customer

base.  Without continuing payments to the Debtor's employees it is unlikely that the workforce

would remain highly motivated to produce quality products – if the employees would even

remain in the Debtor's employ.

72.    It is my belief that pre-sale wages and benefits need to be paid timely and the

Debtor's workforce must be preserved to maximize the value of the business in any sale.

73.    Accordingly, I believe that the payment of the Pre-petition Compensation,

Outstanding Paychecks, Business Expenses, Deductions, Withholdings and Taxes as requested in

the Wages Motion is essential to the success of the Debtor's Chapter 11 case, represents an

exercise of the Debtor's sound business judgment and is in the best interests of the Debtor's

estate, its creditors and other parties-in-interest.

**H.    Motion to Pay Prepetition Claims Incurred but Not Paid Under Its Self-Funded
Employee Health Programs ("Benefits Motion")**

74.    As of the Petition Date, 333 participants and beneficiaries are enrolled in the

Debtor's self-funded group health plan, including 274 current regular employees and their

spouses and dependents, and 59 others who have elected to continue to participate in the

Debtor's self-funded health benefit plan through statutory rights such as COBRA (the "Self-

Funded Health Benefit Plan").

75.    As of the Petition Date, 346 participants and beneficiaries are enrolled in the

Debtor's self-funded group dental plan, including 287 current regular employees and their

spouses and dependents and 59 others who have elected to continue to participate in the Debtor's

WHD/11932840.4

self-funded dental benefit plan through statutory rights such as COBRA (the "Self-Funded
Dental Benefit Plan," and collectively with the Self-Funded Health Benefit Plan, the "Self-
Funded Benefit Plans").

76.     The Debtor incurs and has incurred claims for Self-Funded Benefit Plans ("Self-
Funded Claims") from enrolled participants from both of the groups listed above.[5]  The Debtor
makes contributions to its Self-Funded Benefit Plans out of its general assets to pay Self-Funded
Claims ("Self-Funded Payments").  In addition, participants in the Self-Funded Benefit Plans
also contribute through payroll deduction or monthly payment.

77.     Certain third-party claim administrators process and approve Self-Funded Claims
for the Debtor, and the Debtor then pays the providers the appropriate Self-Funded Payment.
Claims accrue when health services are obtained from a provider, such as a doctor or hospital.
However, it generally takes one to two months for such claims to be processed and billed to the
Debtor.  The Debtor processes the bills and pays the bills in the ordinary course of business
rather than immediately upon receipt.

78.     As of the Petition Date, certain Self-Funded Claims arising from services
rendered to plan participants within 180 days before the date of the filing of the Petition
remained unpaid because the obligation accrued prior to the Petition Date, but did not become
payable in the ordinary course of the Debtor's business until a later date (the "Incurred But Not
Paid Self-Funded Claims").

79.     With respect to the medical health plan, the Debtor purchased stop-loss insurance,
maintained and administered through United Healthcare (the "Stop-Loss Insurer"), which

---

[5]  Debtor may also have incurred Self-Funded Claims in the 180 days preceding the Petition Date from former Self-
Funded Health Benefit Plan participants who have been laid off and/or ceased participation within such 180-day
period.

provides additional insurance for claims above $150,000 (the "Stop-Loss Insurance").  The Stop-Loss Insurance is an integral part of the Debtor's risk management and the loss of coverage would subject the Debtor to undue risk.  The Debtor pays premiums of approximately $24,195 per month to the Stop-Loss Insurer.  As of the Petition Date, the Debtor estimates that it owed the Stop-Loss Insurer approximately $72,586 (October-December) for premiums on account of the Stop-Loss Insurance.

80.     The Debtor seeks authority to pay the estimated $400,000 of Incurred But Not Paid Self-Funded Claims.  The reason these claims remain unpaid is due to the delay between the time of services by medical providers, the billing by those providers to Debtor's claim administrators, the processing of those claims by the claim administrators, the claim administrators' submission of processed claims to Debtor, and the Debtor's payment in the ordinary course of business.

81.     The Debtor also incurs administrative costs incident to the Self-Funded Benefit Plans such as payment to third-party claims administrators for administration of pre-petition Self-Funded Claims (collectively, the "Pre-petition Processing Costs").  Payment of the Pre-petition Processing Costs, if any, is justified because the failure to pay any such amounts might disrupt services of third-party providers with respect to administration of the Self-Funded Benefit Plans. By paying the Pre-petition Processing Costs, the Debtor may avoid even temporary disruptions of such services and thereby ensure that the participants and beneficiaries obtain health benefits without interruption or subsequent denial of service by medical and other providers who performed pre-petition services for plan members.

82.     The Debtor also seeks authority to continue to pay premiums to the Stop-Loss Insurer including amounts that were outstanding as of the Petition Date.  Payment of the

25

premiums is justified because it is necessary to maintain the insurance and will eliminate risk to the Debtor.

83.    I believe that the relief sought by the Benefits Motion is essential to the success of the Debtor's Chapter 11 case. The participants in Debtor's Self-Funded Benefit Plans are essential to operating Debtor's facilities in a safe and prudent manner, administering this case, and preserving the value of the Debtor's business assets.  Any delay or disruption in the payment of such benefits to all plan participants under these extraordinary and difficult circumstances will, in my estimation, destroy the Debtor's relationships with its employees and will irreparably impair morale of the Debtor's remaining workforce at a time when the dedication, confidence and cooperation of the employees are most critical.  There are no practical alternatives to retaining the employees.  The Debtor hopes to use the relief requested in the Benefits Motion to garner post-petition services from its employees.  I believe that failing to do so would substantially jeopardize the Debtor's ability to conduct business.

84.    In light of the foregoing, I submit that the payment of the Self-Funded Claims and related processing costs is essential to the success of the Debtor's Chapter 11 case, represents an exercise of the Debtor's sound business judgment, and is in the best interests of the Debtor's estate and stakeholders.

I.    **Motion for Order Prohibiting Utilities from Discontinuing Service and Establishing Procedures for Adequate Assurance ("Utility Motion")**

85.    In connection with the operation of its business, the Debtor obtains electricity, natural gas, water, sewer, telephone, internet and/or similar services through numerous accounts

26

with various utility companies (individually, a "Utility" and collectively, the "Utilities").  A list of the names and addresses of the Utilities is attached to the Utility Motion as Exhibit A.[6]

86.    The Debtor cannot operate without the services provided by the Utilities, and any disruption, particularly in regard to electricity, gas, water, sewer, telephone, or internet would cause irreparable damage to Debtor's ongoing business operations and estate.  Cessation of the Debtor's business operations would also have a negative impact on the Debtor's customers.  For these reasons, the Debtor must ensure the continued provision of Utility Services.

87.    The Debtor incurs on average, utility charges of approximately $47,000 per month for all Utility Services.  The majority of these charges is for gas, electric and phone services.

88.    After the Petition Date, the Debtor will pay undisputed charges for utility service when due, using proceeds of DIP financing.  The Debtor proposes to submit deposits to each of the Utilities in the amount of one half-month's utility charges, using a 12 month average.  The Debtor also proposes a procedure to be employed by Utilities if they believe greater assurance of payment is necessary.

89.    Granting the relief requested in the Utility Motion is both necessary and appropriate, and will foster continuity of Debtor's operations.  For these reasons and others I believe that the relief requested in the Utility Motion is necessary and in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

---

[6] Although the Debtor believes that the list of Utility Companies attached to the Utility Motion as Exhibit A is a complete list, it reserves the right to supplement the list if it is determined that any Utility Company has been omitted.  Moreover, the Debtor reserves the right to declare that any of the entities listed on Exhibit A are not utilities within the meaning of § 366(a) of the Bankruptcy Code.

WHD/11932840.4

**J.     Motion to Honor and Continue Customer Practices ("Customer Practices Motion")**

90.     Prior to the Petition Date, and in the ordinary course of its business, the Debtor engaged in certain practices to develop and sustain a positive reputation in the marketplace with the Debtor's customers.  These programs include the Debtor's warranty program, as well as other similar practices and commitments directed at customers (collectively, the "Customer Practices").  The Debtor's warranty program is a relatively inexpensive program and insignificant from a cash flow perspective.

91.     The Debtor instituted the Customer Practices to meet competitive pressures, ensure customer satisfaction and generate goodwill—thereby retaining current customers, attracting new customers and ultimately enhancing the value of the business.  I believe that maintaining customer goodwill and repeat business during this Chapter 11 case is essential to the continued vitality of the Debtor's business.  The Debtor intends to sell its business as a going concern.  The value of the business will be driven by the strength of its customer base and its sales potential.  Honoring and maintain the customer programs will allow the Debtor to retain the loyalty and patronage of current customers and attract new customers.  In turn, this will preserve and increase sales revenues, which is a primary driver of the value of the Debtor.

92.     The market for purchasers of the Debtor's business will be expanded by permitting the potential purchasers the flexibility to decide how to address the Customer Practices.  This may include assuming the obligations associated with the Customer Programs as-is, or using the purchaser's already existing warranty program.  However, potential purchasers need the flexibility to decide how to best address the Customer Practices.  This flexibility will make the Debtor's business a viable option for more potential purchasers, which will ultimately lead to a more successful reorganization.

WHD/11932840.4

93.     The post-petition costs to continue the Customer Practices are expected to be comparable to the pre-petition costs and are accounted for in the Debtor's post-petition budget.  I submit that honoring and maintaining the Customer Practices is a good use of the Debtor's resources and in the best interests of the Debtor's estate and stakeholders.

**K.      Motion for Authority to Pay Transportation and Shipping Charges ("Transportation Motion")**

94.     The Debtor relies on third-party shippers (the "Shippers"), to coordinate the transportation of its goods to customers.  The Debtor primarily uses FedEx for all of its shipping needs.  Prior to the Petition Date, FedEx informed the Debtor that it would not continue to do business with the Debtor if the Debtor did not pay outstanding invoices.

95.     FedEx provides the Debtor with more than just shipping services.  FedEx provides the Debtor with services that assist with global logistics and supply chain management.  The Debtor's freight management and customer distribution software systems are tailored to and integrated with FedEx's systems.  Furthermore, the Debtor must ship replacement batteries to customers which are classified as dangerous goods and other Shippers have previously informed the Debtor that they are unwilling to provide those services.  If the Debtor were unable to continue using FedEx and the other Shippers, it would disrupt the flow of raw materials necessary to manufacture product, disrupt customer shipments and cause significant financial harm to the business.

96.     To maintain a reliable, efficient and smooth distribution system and to induce Shippers to continue meeting the Debtor's unique needs, it is imperative that certain of the pre-petition amounts owing to Shippers be paid.  Accordingly, the Debtor seeks authority to pay Shippers, as the Debtor determines is necessary, in the exercise of its business judgment, to avoid disruption of the Debtor's business operations.

29

97.     As of the Petition Date, the Debtor estimates that it owes approximately $418,000 with respect to the Shipping Claims, $397,000 of which is owed to FedEx.  The entities holding Shipping Claims as of the Petition Date, and the amounts of such claims are listed on Exhibit A to the Transportation Motion.

98.     I submit that paying the Shippers, as the Debtor determines is necessary in the exercise of its business judgment, is a good use of the Debtor's resources and is in the best interests of the Debtor's estate and the various stakeholders.

### L.     Motion to Continue Insurance Premium Financing Arrangements ("Insurance Premium Motion")

99.     In the ordinary course of the Debtor's business, the Debtor finances the premiums on some of its insurance policies pursuant to premium financing agreements ("PFAs") with third-party lenders.  Generally, to secure the obligations under the PFAs, the Debtor grants a security interest to the PFA counter-party in the insurance policies and the policy proceeds.

100.     The Debtor has two outstanding PFAs (the "Existing PFAs") with First Insurance Funding Corporation ("First Insurance"), to whom the Debtor pays monthly installments.  With respect to the first PFA, it is paid in full through October, 2015, but it is scheduled for renewal as of November 1, 2015.  The Debtor estimates that under the terms of the renewed PFA, the Debtor would be required to make an initial payment of $204,000 and, thereafter, make monthly payments of $53,000.  With respect to the second PFA, the Debtor makes monthly payments of $13,154.13.  That PFA is scheduled to expire March, 2016.

101.     If the Debtor is unable to continue making payments on the Existing PFAs, First Insurance will be permitted to terminate the Insurance Policies to recoup its losses.  The Debtor would then be required to obtain replacement insurance on an expedited basis and at a

30

tremendous cost to the estate. In light of the importance of maintaining insurance coverage and preserving liquidity by financing its insurance premiums, I believe it is in the best interests of the Debtor's estate to continue honoring obligations under the PFAs and, as necessary, renew or enter into new such agreements. The Insurance Policies are essential to preservation of the Debtor's business operations.

102.    I submit that continuing and renewing the PFAs, and payment of Premium Financing Obligations, are tasks essential to the success of the Debtor's Chapter 11 case, performed in the exercise of the Debtor's sound business judgment. Given the unique nature of insurance premium financing, I do not believe that the Debtor could obtain this type of financing on better terms, on an unsecured basis. I anticipate that the Debtor will have access to sufficient funds from use of cash collateral and/or debtor-in-possession financing to pay all of the Premium Financing Obligations.

DATE: October 20, 2015

By:    Michael Kang
Title: Chief Restructuring Officer

SUBSCRIBED and SWORN to before me this
20th day of October, 2015.

Notary Public

My Commission Expires:  7/24/2016

WHD/11932840.4